IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Crim. No. 1:19-CR-00225 |
| | : | |
| v. | : | |
| | : | |
| **KEVIN BERTRAM** | : | Judge Sylvia H. Rambo |

# M E M O R A N D U M

Before the court is Defendant Kevin Bertram's motion to suppress. (Doc. 71.) After oral testimony and full briefing, this matter is now ripe for disposition. For the reasons stated below, the court will deny the motion.

## I. BACKGROUND

### a. Procedural Posture

On July 24, 2019, a federal grand jury returned a three-count indictment charging with possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A); and felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1.) On August 23, 2019, Mr. Bertram pleaded not guilty to the offenses. (Doc. 12.) Trial is scheduled for October 18, 2021.

Mr. Bertram moves to suppress his statements to police and the physical evidence collected from his person and vehicle. (Doc. 72 at 15.) The following items were found on Mr. Bertram: 6.4 grams of crack cocaine, two razor blades, and

$2,130.00 in cash. (Doc. 75 at 4.) The search of his vehicle uncovered a $15,948.71 U.S. Treasury check, 27.29 grams of crack cocaine, $88.00 cash, and a 9mm Hi-Point firearm loaded with a magazine containing eight rounds. (*Id.* at 5.) At the suppression hearing, the court heard testimony from government witnesses, Detective Schauer and Officer Glatfelter, and defense witness, Mr. Bertram.

   **b. Facts**

On March 1, 2018, Officer Glatfelter of the York County Drug Task Force obtained a search warrant for the second-floor apartment at 241 S. Belvidere Ave, York, Pennsylvania ("Calloway Residence"), rented by Mr. Bertram's friend, Ms. Calloway. (Doc. 75-1 at 4-8.) According to the warrant application, Officer Glatfelter formed probable cause that the residence was being used as a "'crack' cocaine vending operation" because he surveilled a confidential informant's purchase of crack cocaine from Ms. Calloway. (*Id.* at 5-6). The warrant authorized a search of the Calloway Residence and all persons present. (*Id.* at 4, 7.) The warrant permitted officers to search for cocaine; other drugs or paraphernalia; firearms; ammunition; and other items relating to the possession, distribution, and sale of narcotics. (*Id.* at 4.)

On March 1, 2018, at 3:08 p.m., approximately eight officers executed the search. (Doc. 75-2 at 11.) They knocked, announced their presence, and then entered the unit. (*Id.*) Six adults and one child were present at the time of the search. (*Id.*)

Five of the adults were found in the front bedroom—including Defendant Kevin Bertram, a 49-year-old black male who was helping Ms. Calloway hang a television. (*Id.* at 8, 11; Doc. 72 at 2-3.)

Detective Schauer testified that upon entering the front bedroom, he focused on Mr. Bertram, who had proceeded with hanging the television, despite officers yelling "Police!" and storming the room with their guns drawn. Detective Schauer patted down Mr. Bertram's outer clothing and felt at his vest pocket a rock-like substance in a plastic bag. He immediately suspected it was drugs and asked Mr. Bertram whether he was correct, and Mr. Bertram nodded. Detective Schauer searched Mr. Bertram further and found approximately 6.4 grams of crack cocaine, two razors, and $2,130.00 in cash. (Doc. 75 at 4.) He handcuffed Mr. Bertram's hands behind his back and took him to a central room with other secured occupants so police could continue conducting the search. (Doc. 75-2 at 11.)

Both government witnesses testified that Officer Glatfelter explained to the group of secured occupants that he had a warrant to search the residence for drugs, and he read them their *Miranda* rights. (*See also id.* at 11.) Afterwards, he asked the occupants whether they understood their rights, and each in turn stated "Yes." (*Id.*)

While other officers searched the residence, Detective Schauer briefly questioned Mr. Bertram away from the group. Detective Schauer testified that Mr. Bertram wanted to cooperate and said his Toyota 4Runner was outside and contained

drugs and a gun. Officer Glatfelter asked for consent to search the vehicle, and Mr. Bertram stated it was a rental. Officer Glatfelter then asked for permission a second time, and Mr. Bertram provided his consent. (*Id.* at 12). Detective Schauer estimated that this exchange took approximately one minute. A subsequent search of the vehicle, at 4:15 p.m., uncovered a U.S. Treasury check in the amount of $15,948.71, 27.29 grams of crack cocaine, $88.00 in cash, and a 9mm Hi-Point firearm loaded with a magazine containing eight rounds. (Doc. 75 at 5; Doc. 75-1 at 1.)

After agreeing to a more private interview and approximately one hour after officers entered the Calloway Residence, Mr. Bertram was transported to an interview room at the York County Drug Task Force office, where he waited for about twenty minutes. At 4:30 p.m., Detective Schauer gave him a *Miranda* warning (*see* Doc. 75-3) and began to question him. By 4:34 p.m., Mr. Bertram signed an authorization to search his vehicle. (Doc 75-4.) Detective Schauer hand-wrote eighteen statements summarizing Mr. Bertram's disclosures, each of which Mr. Bertram initialed. (Doc. 75-3 at 1-2.) Mr. Bertram acknowledged he rented the black Toyota 4Runner and gave "police permission to search it." (*Id.* at 1.) Beneath the statements, Detective Schauer wrote "This 2 page statement is true and correct & made without threat or promise", and Mr. Bertram signed his name. (*Id.* at 2.) Detective Schauer timestamped the statement "1642," meaning 4:42 p.m. (*Id.*)

Mr. Bertram's testimony differs from the officers' records and testimony as follows. According to Mr. Bertram, when officers entered the front bedroom, he froze with his arms raised and tools in hand. He was surrounded by four officers carrying semi-automatic weapons and screaming for him to stand still, and he thought he was going to die. Detective Schauer patted down his waistline, emptied his pockets, and then cuffed his hands behind his back. He did not receive a group *Miranda* warning, and the officers questioned him away from the group for approximately fifteen minutes, repeatedly asking about his keys and cash.

Mr. Bertram further testified that he refused the request by police to search his vehicle. After about an hour, while he was still handcuffed, Mr. Bertram was transported to a new location and left to wait in a small room for twenty minutes without being offered food, water, or use of the bathroom. He was never *Mirandized*, and his repeated requests for an attorney were ignored. Three officers interviewed him aggressively and banged on the table. They threatened that if he didn't talk, he would "go away for a long time" and would not see daylight or his children. The officers did not physically threaten or harm him, but he nevertheless felt unsafe, and he signed the Written Statement and the Consent to Search Form because he feared for his life.

## II.     STANDARD OF REVIEW

The Fourth Amendment to the United States Constitution grants individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the United States Supreme Court has repeatedly held, "[t]he touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Generally for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356-57 (1967)).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1, (1978) (citing *Simmons v. United States*, 390 U.S. 377, 389–390 (1968)). The government, however, "bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). "The applicable burden of proof is by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

In deciding a motion to suppress, the trial judge, as the fact finder, determines the credibility of the witnesses and the weight to be given the evidence. *See Gov't of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir. 1974) (holding that

"credibility determinations are uniquely the province of the fact-finder"). The court can accept or reject a witness's testimony, assessing credibility on the following factors: demeanor and manner on the stand, ability to accurately recollect, impact of the outcome on the witness, whether the testimony supports or contradicts other evidence, and whether the testimony "withstands a common sense test of reason and logic." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005).

### III.  DISCUSSION

#### A. The search of Mr. Bertram does not require suppression.

Mr. Bertram first contends, relying on *Ybarra v. Illinois*, 444 U.S. 85 (1979), that it was unlawful to search his person simply because he was present at a residence where a search warrant was executed.[1] To be valid, a search warrant must be based on probable cause, be supported by a sworn affidavit, and describe particularly the place of the search and the persons or things to be seized. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). However, evidence recovered pursuant to a deficient warrant does not necessarily require suppression. *See United States v. Leon*, 468 U.S. 897, 918 (1984) ("[S]uppression of evidence obtained pursuant to a warrant should be ordered

---

[1] As the government observed, *Ybarra* is factually distinct from the instant case in two important ways: (1) the warrant in *Ybarra* was for the premises only and did not include the "all persons present" clause, and (2) the warrant was for a business, not a residence. (Doc. 75 at 11.) The Third Circuit also distinguished these two specific facts from *Ybarra* in holding an "all persons present" warrant to search a residence suspected of drug trafficking was supported by probable cause. *United States v. Abbott*, 574 F.3d 203, 212 (3d Cir. 2009), *aff'd*, 562 U.S. 8 (2010).

only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule."). Under the good-faith exception established in *Leon*, the court cannot exclude evidence obtained through an improper warrant where "police acted in objectively reasonable reliance on the subsequently invalidated search warrant." *Virgin Islands v. John*, 654 F.3d 412, 417-18 (3d Cir. 2011) (internal quotations omitted). The Third Circuit has held "exclusion will not deter police from relying on an invalid warrant unless the police should reasonably have known that the warrant's issuance would be found unconstitutional."[2] *Id.* at 418.

Here, Mr. Bertram's person was lawfully searched pursuant to a valid search warrant that was supported by probable cause. Ms. Calloway's recent sale of crack cocaine to a confidential informant inside her residence provided adequate probable cause for believing that the residence was being used as a crack cocaine vending operation, and that the occupants inside the residence were involved in the operation. The warrant was supported by Detective Glatfelter's sworn affidavit and it stated

---

[2] There are four circumstances where an officer's reliance upon a warrant will be deemed objectively unreasonable: (1) where the magistrate judge relied upon "deliberately or recklessly false" statements in the warrant affidavit; (2) where the magistrate "abandoned his or her judicial role and failed to perform his or her neutral and detached function"; (3) "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) "where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *John*, 654 F.3d at 418.

The "all persons present" clause only plausibly implicates the last two circumstances, but the Third Circuit analyzed the clause for deficiency in probable cause rather than particularity. *See United States v. Abbott*, 574 F.3d 203, 212 (2009). Absent a ruling from the U.S. Supreme Court on the clause's validity, the Third Circuit has held that "a warrant may authorize the search of all persons present if there is probable cause to believe that a premises is dedicated to criminal activity. *Id.*

with sufficient particularity that the place to be searched was the Calloway Residence and that the items to be seized included, among other things, cocaine, firearms, ammunition, and other narcotics-related items. (*Id.* at 4-8.) Given the validity of the warrant, it was not unlawful for police to search Mr. Bertram's person in accordance with its terms, and suppression is not required.

In addition, even if the warrant was not supported by sufficient probable cause, suppression would still be inappropriate because law enforcement reasonably relied upon its issuance. The warrant expressly permitted the search of all persons present, and Officer Glatfelter testified that similar clauses appeared in all previous search warrants involving residences that were suspected to contain drug operations. The warrant was not facially deficient because it specifically stated what could be searched and what items could be seized. Similarly, the facts here do not suggest that officers should have reasonably known that the facts in Officer Glatfelter's affidavit would not sufficiently support probable cause, and that the warrant was thus issued in error. Accordingly, the purpose of the exclusionary rule to deter police from unlawful search and seizure would not be served by suppressing the evidence. Because the officers' reliance on the warrant was reasonable, suppression is not required.

### B. Mr. Bertram's statements do not require suppression.

Mr. Bertram additionally argues his statements to law enforcement should be suppressed because he was never *Mirandized*. The Fifth Amendment requires that a person subject to custodial interrogation by a police officer be advised that (1) he has a right to remain silent; (2) anything he says can be used against him in court; (3) he has the right to the presence of an attorney; and (4) if he cannot afford an attorney, one will be appointed for him. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Saranchak v. Beard*, 616 F.3d 292, 302 (3d Cir. 2010). Absent a *Miranda* warning, statements made during a custodial interrogation must be suppressed. *Saranchak*, 616 F.3d at 302.

Here, Mr. Bertram maintains officers did not give him a *Miranda* warning even though he was subject to police interrogation and objectively not free to leave. Despite his claim, Detective Schauer and Officer Glatfelter credibly testified that Officer Glatfelter *Mirandized* Mr. Bertram collectively with the other secured occupants of the residence and that Mr. Bertram verbally affirmed he understood. The Incident Report, prepared contemporaneously by Officer Glatfelter, corroborates this testimony. (Doc.75-2 at 11.) Detective Schauer further credibly testified that he *Mirandized* Mr. Bertram at the beginning of their second interview. Detective Schauer's notation of "Rights 1630" on the Written Statement supports his testimony. (Doc. 75-3 at 1.)

The court credits the officers' testimony over Mr. Bertram's on this matter. Officer Glatfelter's contemporaneously prepared Incident Report includes a detailed narration of events that spans three single-spaced pages. (Doc. 75-2.) Similarly, in their testimony, Officer Glatfelter and Detective Schauer included specific details that were consistent with one another's accounts and with the record. They were also forthcoming about what they could not recall (*e.g.*, whether Officer Glatfelter personally detained any occupant, and whom; whether any or all officers had drawn their weapons when entering the bedroom; the location and actions of all officers at specific times). In contrast, Mr. Bertram testified more generally that he was not *Mirandized* and that he was coerced. His testimony meaningfully departed from contemporaneous records and the testimony of multiple government witnesses, regarding his repeated requests for an attorney[3] and even the uncontentious question of the time of day. Although Mr. Bertram testified repeatedly that the search began shortly after 10:00 a.m., the overwhelming evidence from the record—including the Incident Report, testimony from multiple government witnesses, and the 1:40 p.m. timestamp on the issued warrant—indicates the search occurred over five hours later.

---

[3] The court does not need to decide whether Mr. Bertram's constitutional rights were violated based on his testimony that he was questioned after he requested counsel. This ground for suppression was not raised in the motion or brief, and Defendant declined to submit additional briefing after the hearing.

(Doc. 75-2 at 4; Doc. 75-1 at 1.) As a final credibility consideration, Mr. Bertram's great stake in the outcome, his personal freedom, creates a strong motive to fabricate.

The court thus finds by a preponderance of evidence that Mr. Bertram was *Mirandized*, and as a result, his statements do not need to be suppressed.

### C. Mr. Bertram consented to the vehicle search.

Mr. Bertram further argues that police lacked consent to search his vehicle. If a consent to search is voluntary, a warrantless search is permissible and seized evidence will be admissible at trial. *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967). Consent is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The government carries the burden of proving by a preponderance of the evidence that the consent was freely and voluntarily given. *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989); *Schneckloth*, 412 U.S. at 222. In determining whether a consent to search is voluntary, a court must look at the totality of the circumstances. *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). The Third Circuit has instructed that relevant factors to consider include:

> the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; [ ] the use of physical punishment[;] . . . the setting in which the consent was obtained[;] and the parties' verbal and non-verbal actions.

*Id.* (internal citations and quotations omitted). These factors are not applied mechanically and no one factor is dispositive. *Id.* Thus, the court may examine any and all factors that are relevant to whether Defendant's consent was voluntary.

In this case, Mr. Bertram argues that police unlawfully searched his vehicle because he never provided verbal consent for the search.[4] Here too, Mr. Bertram's version of the events stands in stark contrast to contemporaneous law enforcement records and the credible testimony of multiple experienced law enforcement officers. The officers' testimony and report on the issue was specific and detailed, including their recollections that Mr. Bertram represented that he wanted to cooperate and tell the truth—a fact that was corroborated by Mr. Bertram's actions throughout the encounter including his ostensible cooperation and written consent at the police station. Given these considerations, and for the reasons discussed above with respect to credibility of the witnesses, the court comfortably credits the evidence submitted by the government that Mr. Bertram provided verbal consent to search the vehicle.

Finally, upon weighing the relevant factors, the court finds that Mr. Bertram's verbal consent for the search was voluntary. Mr. Bertram is a 49-year-old man with some college education and experience owning and operating small businesses. He was advised of his *Miranda* rights on two separate occasions, and he has a history

---

[4] The court finds that Mr. Bertram did not provide written authorization for the search of his vehicle until after the search had already occurred. As such, it need not address Mr. Bertram's arguments that he was coerced into providing the written authorization.

of protracted interactions with law enforcement that invoke at least some minimal shrewdness concerning police procedure. Mr. Bertram's first interview with police was brief and lasted as little as one minute and no more than fifteen, and his second interview lasted only twelve minutes. Indeed, little more than one-and-a-half hours elapsed from officers' initial foray into the Calloway Residence at 3:08 p.m. until Mr. Bertram provided a statement and written consent at 4:42 p.m.

In addition, Mr. Bertram does not credibly allege any actual or threatened physical punishment throughout the entirety of the encounter, other than the fact that police drew and pointed their weapons upon initially entering the residence.[5] The time and place of the interviews do not raise any particular concerns of coercion, and for the reasons discussed above, the court does not find Mr. Bertram's testimony that police ignored his requests for an attorney credible. Mr. Bertram's claims of extensive intimidation tactics do not square with the record evidence, which reflects Mr. Bertram's swift and consistent cooperation throughout the entirety of his encounter with law enforcement. Weighing these considerations, the court finds that Mr. Bertram's statements to law enforcement and consent to search were voluntary.[6]

---

[5] The court discounts Mr. Bertram's testimony that officers had their guns drawn after he was detained and throughout the course of the initial interview, as it contradicts the officers' testimony and largely defies common sense.

[6] Because the court finds that Mr. Bertram voluntarily consented to the vehicle search, it does not decide whether probable cause alternatively justified the search, as the government argued.

## IV. CONCLUSION

For the reasons stated above, the court will deny Defendant's motion to suppress. An appropriate order shall follow.

*s/Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: October 20, 2021